**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNTERMOTORISIERT GMBH,<br><br>        Plaintiff,<br><br> -against-<br><br>EDGAR BRONFMAN, JR.,<br><br>        Defendant. | Case No.: 25-cv-3179<br><br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Untermotorisiert GmbH ("Plaintiff"), by and through its undersigned attorneys, hereby files this Complaint against defendant Edgar Bronfman, Jr. ("Defendant") and alleges as follows:

**NATURE OF ACTION**

1. This dispute arises from Defendant's unjustified refusal to honor the unambiguous terms of a binding agreement to purchase Plaintiff's interest in an investment fund.

2. In 2021, Defendant was seeking capital for Global Thermostat Operations, LLC and Global Thermostat Licensing, LLC (together, "GT")—entities developing technology to capture carbon dioxide emissions—for which Defendant was, or intended to be, Chairman.

3. In soliciting capital for GT, Defendant worked closely with his son Benjamin Z. Bronfman ("Ben"), who, upon information and belief, under the direction of and with assistance from Defendant, created ET Fund 1 (GT) LLC ("ET Fund"), an investment fund whose primary purpose was to invest in GT.

4. Ben, upon information and belief, with support and direction from his father, thereafter approached Plaintiff's Managing Director with an investment proposal: purchase a membership interest in ET Fund and, through that interest, share in the profits of GT.

1

5.      Plaintiff was intrigued by the work GT was doing and interested in the investment opportunity presented by the Bronfmans, but had concerns about GT's capitalization and access to equity. Plaintiff thus sought assurances that if Plaintiff invested in GT through ET Fund, ET Fund's investment in GT would be large enough to ensure GT's success—and that if GT's growth fell short of expectations, Plaintiff would have an exit strategy.

6.      Thus, Plaintiff negotiated the terms of an investment in ET Fund, including the following material condition: should ET Fund fail to purchase at least $20,000,000 of equity in GT by a date certain, then Plaintiff could exercise a put right on its interest in ET Fund and force Defendant to buy Plaintiff's entire interest in ET Fund for the amount that Plaintiff contributed to ET Fund.

7.      Defendant and ET Fund agreed to those terms. So, on December 21, 2021, Plaintiff signed a subscription agreement with ET Fund providing just over $1,000,000 in investment to ET Fund, and, concurrently, Plaintiff and Defendant signed an agreement to give Plaintiff a put option on Plaintiff's interest in ET Fund (the "Put Option Agreement"), which Plaintiff could exercise against Defendant in the event of certain specified conditions, including if ET fund failed to purchase at least $20,000,000 of equity in GT.

8.      Ultimately, ET Fund fell far short of the $20,000,000 commitment it made.

9.      Due to ET Fund's shortfall, GT raised more capital from other parties (at terms deeply unfavorable to the ET Fund investors). GT's acquisition of such third-party capital diluted the value of Plaintiff's interest in ET Fund. Ultimately, GT's efforts to sustain its business through third-party investors failed and GT sold all of its assets to another company, resulting in the near total loss of Plaintiff's investment.

10. After ET Fund failed to complete its promised $20,000,000 investment in GT by the agreed upon date, Plaintiff exercised its put option and gave notice that Defendant must purchase Plaintiff's interest in ET Fund for the agreed-upon price (i.e. the amount Plaintiff had paid for its investment in ET Fund). Upon receiving the notice, Defendant, recognizing his obligation, represented that he would comply and purchase the interests.

11. But, after a period of silence, Defendant refused to honor the Put Option Agreement, arguing that amendments to the underlying term sheet between GT and ET Fund—which post-dated the Put Option Agreement, which were not referenced or contemplated by the Put Option Agreement, and to which Plaintiff was not a party—changed the unambiguous terms of the Put Option Agreement such that the necessary condition did not arise.

12. Despite his clear and unambiguous promises, Defendant still refuses to honor the terms of the Put Option Agreement.

## THE PARTIES

13. Plaintiff Untermotorisiert GmbH is a German limited liability company that invests in low-carbon public equities and companies that support decarbonizing technologies. Plaintiff is incorporated and has its principal place of business in the Federal Republic of Germany.

14. Defendant Edgar Bronfman, Jr. is an individual businessman and media investor who, upon information and belief, is domiciled in New York, New York.

## JURISDICTION AND VENUE

15. Subject matter jurisdiction exists under 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendant and the amount in controversy substantially exceeds $75,000.

16. This Court may exercise personal jurisdiction over Defendant pursuant to 28 U.S.C.§ 1391 based on, among other things, the terms of the Put Option Agreement pursuant to which Defendant submitted to the jurisdiction of this Court. Section 8 of that Agreement provides that "[a]ny legal suit, action or proceeding arising out of or based upon the Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America . . . located in the city of New York." The Put Option Agreement further provides that "each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding" and that the parties "irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum."

17. Moreover, this Court has personal jurisdiction over Defendant because, upon information and belief, Defendant is domiciled in New York, and the acts giving rise to this dispute occurred in New York.

**FACTUAL BACKGROUND**

**A.   The ET Fund LLC Agreement**

18. ET Fund was formed as a limited liability company under Delaware law on December 21, 2020. Ben, upon information and belief, at the direction and with assistance of Defendant and together with an affiliated entity, formed ET Fund for the object and purpose of investing in GT.

19. Under the Amended and Restated Limited Liability Company Agreement of ET Fund 1 (GT) LLC ("LLC Agreement"), executed on December 20, 2021, while ET Fund was permitted to engage in other short-term investments for purposes of paying for fees and expenses, its predominant purpose was to invest in GT.

20. The LLC Agreement provided that individuals or entities could become Members of ET Fund by completing a subscription agreement.

21. To complete the subscription agreement, the Member in question was required by the LLC Agreement to make a capital contribution.

22. The LLC Agreement also provided that ET Fund's business affairs would be conducted exclusively by its "Manager." From the formation of ET Fund until the present, ET General Partner Entity, LLC—for which Ben has, at all relevant times, served as Managing Director—has been the Manager.

23. A Member's subscription agreement was not effective until signed and approved by the Manager.

24. Subject to the terms of the LLC Agreement, the Manager also had sole discretion over the amount, timing, and form of any distributions of profits to Members.

25. The LLC Agreement had explicit provisions as to the proportions of distributions, as follows:

    a. The LLC Agreement directed the Manager to make 100% of distributions to Members until each Member received aggregate distributions equal to its respective total capital contributions to ET Fund;

    b. Once each Member had recouped its investment through distributions, the LLC Agreement directed the Manager to make 100% of distributions to Members until each Member received aggregate distributions equal to another 8% of its respective total capital contributions to ET Fund;

    c. Once each Member had recouped 108% of its investment through distributions, and should GT's fair market value equal less than or exactly

10 times the total amount paid by ET Fund to acquire equity in GT, the LLC Agreement directed the Manager to make 20% of each distribution to the Manager and 80% to Members;

d. If instead GT's fair market value was equal to between 10 times and 20 times the total amount paid by ET Fund to acquire equity in GT, the LLC Agreement directed the Manager to make 25% of each distribution to the Manager and 75% to Members;

e. If instead GT's fair market value was equal to between 20 times and 30 times the total amount paid by ET Fund to acquire equity in GT, the LLC Agreement directed the Manager to make 30% of each distribution to the Manager and 70% to Members;

f. And if, instead, GT's fair market value was more than 30 times the total amount paid by ET Fund to acquire equity in GT, the LLC Agreement directed the Manager to make 40% of each distribution to the Manager and 60% to Members.

**B.    The ET/GT Term Sheet**

26.    On November 19, 2021, ET Fund, GT, and individuals Defendant Edgar Bronfman Jr., Graciela Chichilnisky, and Peter Eisenberger (the "GT Parties"), effectuated the Global Thermostat Licensing, LLC and Global Thermostat Operations, LLC Term Sheet for Equity Financing and Restructuring (the "Term Sheet"). The Term Sheet described in detail ET Fund's commitment to invest in GT.

27.    To start, ET Fund agreed to invest $5,000,000 in GT pursuant to a Simple Agreement for Future Equity Agreement (the "SAFE Agreement").

28. Pursuant to the SAFE Agreement, ET Fund agreed to execute the SAFE Agreement within 10 business days of executing the Term Sheet, and agreed to invest the $5,000,000 within 5 business days after the SAFE agreement was executed (the "Initial Closing").

29. ET Fund further agreed to purchase, in the aggregate, a minimum of $20,000,000 in equity in GT after the Initial Closing (the "Purchase Right Investment"). That $20,000,000 would include:

   a. $500,000 previously funded by ET Fund;

   b. The $5,000,000 under the SAFE Agreement; and

   c. At least $14,500,000 in additional investment, including all investments made by Defendant and other investors in the period between the signing of the Term Sheet and the closing of the Purchase Right Investment.

30. ET Fund agreed to execute the Purchase Right Investment by the end of the "Negotiation Period," defined by the Term Sheet as 50 days after the GT Parties executed the Term Sheet—which, at the date of execution, was January 6, 2022 (the "Target Closing Date").

31. Defendant served as a member of GT's board and/or boards both leading up to and during the Term Sheet's negotiation, as well as during all of GT's subsequent financing rounds and GT's eventual sale. Upon information and belief, Defendant has continued to serve on GT's board and/or boards until the present.

**C. The Put Option Agreement and Plaintiff's Investment in ET Fund**

32. Plaintiff became acquainted with Defendant and Ben in or around February 2021 when Ben approached Plaintiff's Managing Director—in connection with his work with a separate venture capital company—about a potential investment in GT.

33. When it was determined that that separate venture capital company was not, pursuant to its investment guidelines, permitted to invest indirectly in GT through ET Fund, Ben began pitching the investment to Plaintiff.

34. Thus, in or around June 2021, Plaintiff, Defendant, and Ben began discussing the possibility of Plaintiff investing in GT through a membership interest in ET Fund.

35. From his due diligence into GT, Plaintiff's Managing Director was aware that GT had experienced cashflow and governance challenges in the past. On several occasions when Plaintiff's Managing Director expressed concerns to Ben about a potential investment in ET Fund, Ben would put Plaintiff in touch with Defendant who would address Plaintiff's concerns.

36. Chief among Plaintiff's concerns was the risk that GT would fail to gain sufficient access to equity and would not be adequately capitalized. Accordingly, Plaintiff sought Defendant's and Ben's agreement that Plaintiff's investment would be protected should ET Fund fail to meet its promise to ensure that GT obtained $20,000,000 in investments as required under the Term Sheet.

37. In response to Plaintiff's concerns, and as a material condition of Plaintiff's investment, Defendant agreed to provide Plaintiff with a put option, such that under certain conditions Defendant would purchase Plaintiff's interest in ET Fund. Defendant agreed to these conditions to induce Plaintiff to invest in ET Fund.

38. Thus, on December 20 and December 21, 2021, Plaintiff entered into the agreements effectuating Plaintiff's investment in ET Fund (the "Transaction"), as follows:

39. On December 20, 2021, Plaintiff and Ben both signed a side letter contemplating Plaintiff's forthcoming subscription agreement with ET Fund (the "Side Letter").

40. Also on December 21, 2021, Plaintiff and Defendant entered into the Put Option Agreement.

41. Under § 1(a) of the Put Option Agreement, Defendant agreed to give Plaintiff the right to cause Defendant to purchase Plaintiff's interest in ET Fund (the "Put Right") under any of the following circumstances (collectively, the "Put Option Conditions"):

    a. Section 1(a)(1): If GT did not have an initial public offering or gain access to the public equity markets through a special purpose acquisition company by January 15, 2025;

    b. Section 1(a)(2): If the Purchase Right Investment as defined in the Term Sheet did not close by the Target Closing Date—in other words, if ET Fund failed to invest $20,000,000 in GT as described by the Term Sheet;

    c. Section 1(a)(3): If the corporate organizational documents of GT restructuring contemplated by the Term Sheet did not include a provision requiring no more than a majority of directors to approve any sale or change of control of GT for proceeds of $500,000,000 or more.

42. All references to the Term Sheet in the Put Option Agreement explicitly referred to the Term Sheet for Equity Financing and Restructuring dated November 19, 2021 and did *not* incorporate (or even contemplate) any future amendments thereto.

43. Upon the occurrence of any of the Put Option Conditions, Plaintiff could exercise its Put Right, pursuant to § 1(b)(1) of the Put Option Agreement, by delivering to Defendant by April 14, 2025, a written, unconditional and irrevocable notice (the "Put Exercise Notice").

44. Under § 1(b)(3) of the Put Option Agreement, Defendant was required to purchase Plaintiff's interest no later than 120 days following Defendant's receipt of the Put Exercise Notice.

45. Under § 2 of the Put Option Agreement, the price of the sale was as follows:

   a. In the event of the condition described in § 1(a)(1) of the Put Option Agreement—that is, if GT did not go public by January 15, 2025—the purchase price was 110% of the amount that Plaintiff contributed to ET Fund.

   b. In the event of either of the conditions described at §§ 1(a)(2) or 1(a)(3) of the Put Option Agreement—that is, if ET Fund failed to invest $20 million by the Target Closing Date or if GT's corporate organizational documents no longer required a majority of directors to approve a large sale or change of control—the purchase price was the amount that Plaintiff contributed to ET Fund.

46. The Put Option Agreement further provided that Plaintiff and Defendant should cooperate and take all actions as may be reasonably necessary to consummate the sale contemplated under the Put Option Agreement.

47. In reliance on Defendant's and Ben's assurances and concessions, on December 21, 2021, Plaintiff effectuated a subscription agreement to ET Fund (the "Subscription Agreement") and agreed to contribute $1,000,000 to ET Fund.

48. In his capacity as ET Fund's Manager, Ben accepted the Subscription Agreement and Plaintiff's concomitant contribution commitment the same day.

49. Pursuant to the terms of the LLC Agreement and the Subscription Agreement, Plaintiff fulfilled its promised contribution of $1,000,000 to ET Fund on December 29, 2021, and Plaintiff made its promised payment of $58,713 in associated fees on January 4, 2022.

**D.  Later Amendments to the Term Sheet**

50. After execution of the Transaction documents (including the Put Option Agreement) and Plaintiff's $1,058,713 contribution to ET Fund in connection with the same, the GT Parties—of which Plaintiff was not a part—executed a number of amendments to the Term Sheet between March 2022 and August 2022 that modified the terms of the equity financing agreement as between ET Fund and GT.

51. Among other things, the multiple amendments to the original Term Sheet modified the aggregate investment commitment ET Fund was to make in GT and extended the deadline for completing such financing from January 6, 2022 to (ultimately) August 12, 2022

52. Upon information and belief, the final such amendment was executed by the GT Parties on August 1, 2022 ("Amendment 5").

53. Pursuant to Amendment 5, the GT Parties to reduce ET Fund's financing commitment from the $20,000,000 in equity originally agreed upon to just $14,000,000, which included the following:

   a. $500,000 previously funded by ET Fund;

   b. $6,100,000 under the SAFE Agreement and other simple agreements for future equity between ET Fund and Defendant;

   c. $2,100,000 plus any additional principal amounts funded by a $3,000,000 promissory note issued by GT Operations to Defendant on March 31, 2022; and

   d. Unspecified additional investments.

54. Plaintiff did not participate in, and was not privy to, negotiations concerning any amendments to the Term Sheet and Defendant did not seek, let alone obtain, any amendment to the Put Option Agreement which incorporated by reference the terms of the original Term Sheet.

### E. Plaintiff Exercises Its Put Right

55. Pursuant to the revised terms in Amendment 5, ET Fund closed on the Purchase Right Investment in August 2022.

56. The Purchase Right Investment did not meet the specifications in the original Term Sheet. ET Fund only invested approximately $5,000,000 pursuant to the SAFE Agreement, and, in the end, GT acquired only $14,000,005 in investments to effectuate the Purchase Right Investment under the terms of Amendment 5 rather than the $20,000,000 required under the original Term Sheet and incorporated by reference in the Put Option Agreement.

57. Moreover, GT failed to close the Purchase Right Investment by the January 6, 2022 deadline originally agreed upon and instead delayed closing by nearly eight months, putting GT in a significantly worse liquidity position than it would have occupied had the terms of the original Term Sheet been satisfied.

58. ET Fund's failure to meet the terms of the original Term Sheet reduced the value of Plaintiff's investment in ET Fund and triggered Plaintiff's right to exercise its put option under the Put Option Agreement.

59. In part because ET Fund failed to purchase $20,000,000 in investments for GT as required under the original Term Sheet, and in part because the Amendments to the Term Sheet delayed these investments from January 2022 to August 2022, GT spent the bulk of 2022 strapped for cash.

60. As a result, GT was forced to obtain additional capital from other investors in November 2022, only three months after the amended Purchase Right Investment closed. This second bid for investors was known as the "Recapitalization Round" or "Recap Round."

61. These equity investments obtained in the Recap Round diluted the value of ET's existing equity investments in GT. Because the Recap Round brought on new shareholders, any GT profits would thereafter be distributed among a larger group of equity-holders, and each investor would receive a smaller share of profits.

62. Accordingly, GT's Recapitalization Round diluted the value of ET Fund's investment in GT by roughly half, which in turn significantly reduced returns to be received by each ET Fund member, including Plaintiff.

63. Not all GT investors were as negatively impacted by the Recap Round. Those who had purchased convertible notes in GT prior to ET Fund's SAFE investment, like the company Zero Carbon Systems, Inc. ("ZCS"), were not similarly diluted by the Recap Round, resulting in the unusual and highly unexpected scenario whereby SAFE investors, like Plaintiff, were treated significantly worse than those who invested earlier. While launching a funding round that materially and negatively changed the terms of ET Fund's investment in GT in November 2022, GT did not renegotiate the terms of its arrangements with noteholders like ZCS (who ultimately benefited from a discount on the Recap Round).

64. Had the Purchase Right Investment as defined in the original Term Sheet been effectuated, and had ET Fund thereby ensured the investment of at least $20,000,000 in GT by January 2022, GT would not have been forced to raise any or as much additional equity. Accordingly, the value of ET Fund's investment in GT (and the corresponding value of Plaintiff's interest in ET Fund) would not have been diluted or would have been less diluted.

65. On November 21, 2022, Plaintiff's Managing Director emailed Defendant and Ben, expressing concerns about Recap Round and the dilution of Plaintiff's investment in ET Fund.

66. In response, instead of allaying Plaintiff's concerns, Defendant pressured Plaintiff to invest more money into GT during the Recap Round, which Plaintiff eventually refused to do.

67. On September 15, 2023, Plaintiff's Managing Director, on behalf of Plaintiff, sent Defendant and Brian Stadler at Simpson Thatcher & Bartlett LLP—an agent designated to receive legal notice on Defendant's behalf—a letter indicating that Plaintiff was exercising its Put Right pursuant to the Put Option Agreement for the price of $1,058,713 (the "Put Exercise Notice").

68. Pursuant to § 1(a)(2) and § 2 of the Put Option Agreement, $1,058,713 constituted the sum total of Plaintiff's contribution to ET fund.

69. The Put Exercise Notice provided that Plaintiff's exercise of its Put Right was predicated on the fact that ET Fund had not effectuated the Purchase Right Investment according to the original Term Sheet because it had not invested at least $20,000,000 in GT.

70. But, in the following days, Defendant did not acknowledge the Put Exercise Notice. Plaintiff's Managing Director, on behalf of Plaintiff, emailed Defendant concerning the Put Exercise Notice but received no response.

71. Thereafter, Plaintiff's outside counsel contacted Brian Stadler multiple times to confirm Defendant's receipt and acknowledgement of the Put Exercise Notice.

72. On or about November 14, 2023, Defendant responded, finally acknowledging the Put Exercise Notice.

73. After some back and forth, Defendant represented that he would comply and purchase the interests, but, even after confirming his commitment, he still failed to purchase the interests.

74. 120 days after Defendant's receipt of the Put Exercise Notice, Defendant had still not purchased Plaintiff's interest in ET Fund as required by the Put Option Agreement.

75. To date, Defendant has not purchased Plaintiff's interest in ET Fund in response to the Put Exercise Notice as required by the Put Option Agreement and, to the contrary, has confirmed, through counsel, that he has no intent to do so.

76. On April 29, 2024, GT sold its company interests to ZCS—a prior holder of convertible notes in GT as described above—and GT became a subsidiary of ZCS. Because of the preferential treatment afforded to noteholders like ZCS in the Recap Round, ZCS was in a stronger position to acquire GT than were investors who were diluted.

77. As a result of GT's stock sale to ZCS, ET Fund received so little on its investment in GT that it never made a profit, and Plaintiff never earned a cent on its investment in ET Fund.

78. To date, Defendant has not purchased Plaintiff's ET Fund interest as required by the Put Option Agreement.

**FIRST CAUSE OF ACTION**
**(Breach of Contract)**

79. Plaintiff repeats each of the foregoing allegations as if fully set forth herein.

80. The Put Option Agreement, alongside the related and concurrently executed Subscription Agreement and Side Letter, contains the material terms of an enforceable contract between and/or among Plaintiff and Defendant.

81. Under § 1(a) of the Put Option Agreement, Plaintiff has the right to cause Defendant to purchase its membership interest in ET Fund should any one of the Put Option Agreement's three listed Put Option Conditions be met.

82. Section 1(a)(2) of the Put Option Agreement provided that one of the Put Option Conditions was if ET Fund's Purchase Right Investment in GT, as defined in the November 2021 Term Sheet, did not close for at least $20,000,000.

83. The Purchase Right Investment, as defined in the November 2021 Term Sheet, did not close for $20,000,000. ET Fund and Defendant only invested $14,000,005 in GT, instead of the $20,000,000 promised in the November 2021 Term Sheet and incorporated by reference in the Put Option Agreement.

84. Plaintiff performed under its agreement with Defendant by, among other things, delivering the Put Exercise Notice to Defendant's designated agent on September 15, 2023, pursuant to § 1(b)(i) of the Put Option Agreement.

85. Defendant acknowledged the Put Exercise Notice on November 14, 2023, (well before the April 14, 2025 date on which the Put Option expires).

86. Defendant did not purchase Plaintiff's interest in ET Fund by 120 days after receipt of the Put Exercise Notice, as required by § 1(b)(iii) of the Put Option Agreement.

87. By failing to purchase Plaintiff's interest in ET Fund by the allotted date, Defendant materially breached the Put Option Agreement.

88. As a direct and proximate consequence of Defendant's material breach of the Put Option Agreement, Plaintiff suffered substantial damages in an amount to be determined at trial, and no less than $1,058,713 plus interest.

## SECOND CAUSE OF ACTION
### (Promissory Estoppel)

89. Plaintiff repeats each of the foregoing allegations as if fully set forth herein.

90. Defendant made a clear and unambiguous promise to Plaintiff that, should the Purchase Right Investment as defined in the November 2021 Term Sheet (including ET Fund investing $20,000,000 in GT) not close, Plaintiff would have the right to cause Defendant to purchase Plaintiff's interest in ET Fund for the amount that Plaintiff contributed to ET Fund on a date no later than 120 days after receiving notice that this condition had arisen and that Plaintiff wished Defendant to purchase Plaintiff's interest in ET Fund.

91. Because Defendant is a sophisticated and reputable businessman and investor, and because Defendant made the above-described promise to induce Plaintiff to invest in ET Fund, Plaintiff reasonably relied on Defendant's above-described promise.

92. For the same reasons, Defendant should have reasonably foreseen that Plaintiff would rely on Defendant's above-described promise.

93. Plaintiff detrimentally relied on Defendant's above-described promise by contributing $1,058,713 to obtain an interest in ET Fund.

94. The Purchase Right Investment, as defined in the November 2021 Term Sheet, did not close.

95. Plaintiff put Defendant on notice that Defendant should purchase Plaintiff's interest according to Defendant's promise.

96. Defendant did not purchase Plaintiff's interest in ET Fund by the date 120 days after receipt of that notice.

97. By failing to purchase Plaintiff's interest in ET Fund in the allotted time, Defendant did not keep his above-described promise.

98. As a direct and proximate consequence of Defendant's failure to keep his promise, and of Plaintiff's reasonable, foreseeable, and detrimental reliance on that promise, Plaintiff suffered substantial damages in an amount to be determined at trial

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor and against Defendant as follows:

A. Awarding specific performance of Defendant's purchase obligation under the Put Option Agreement, such that Defendant purchases Plaintiff's interest in ET Fund for $1,058,713 plus statutory interest;

B. Awarding general and compensatory damages to Plaintiff in an amount to be determined at trial;

C. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury on all issues that are so triable.

Dated: New York, New York
April 17, 2025

Respectfully submitted,
*/s/ Erica A. Wolff*

Erica A. Wolff
Samuel R. Prose

SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
Tel.: (212) 202-2600
Fax: (212) 202-4156
ewolff@shertremonte.com

*Attorneys for Untermotorisiert GmbH*